Weaver v. Randy Pfister Good morning, and may it please the court. Mr. Weaver was unconstitutionally denied his right to the counsel of his choice. There simply was no serious potential conflict that could justify disqualification under Wheat. The state still hasn't identified any conflict that was actually likely to occur at the trial, and any conflict that did come up could have been easily avoided. Under identical facts in Rodriguez, this court found a constitutional violation. To make matters worse, Weaver's replacement counsel was unconstitutionally ineffective. Counsel failed to cross-examine the state's only eyewitness on a critical prior statement. Now, you know, Mr. Ray, you've argued that Rodriguez is directly on point on the issue of disqualification. But we said in Rodriguez that the disqualification stemmed from the prosecutor's assurance that the witness was vital to the state's case. And then the state later failed to argue the witness had any admissible evidence. So why wouldn't that distinguish Rodriguez? I mean, it seems that Trawick did have vital information to the state's case. Lupe had not only confessed his own involvement, but had told Trawick that Weaver was also involved. Can you account for this seemingly somewhat critical distinction? Yes, Your Honor. In both Rodriguez and in this case, the state, after going to the court and securing disqualification of the defendant's chosen counsel, then didn't call that witness when it came to trial. And the Rodriguez court found that important for a couple of reasons. One, just because that's something that goes into the calculus as to whether or not a conflict is actually likely to occur. Second, the Rodriguez court was worried about prosecution possibly putting a witness on a witness list and securing the disqualification of chosen counsel, and then just failing to call the witness. But in both Rodriguez and in this case, the prosecution said that this was a witness that might be called, got the disqualification because of that, and then failed to call that witness. Now, Rodriguez v. Chandler is an important case because it shows how this court applies the rule that the Supreme Court articulated in Wheat. That rule is that there is a presumption in favor of a defendant's counsel of choice. That presumption can only be overcome when there is an actual conflict or a serious potential for conflict. The Supreme Court then reiterated how important this right is in the United States v. Gonzales-Lopez two decades later, when it found that the right to counsel of choice is so important that if you deny that right without finding a serious potential for conflict, then it creates a structural error in the very framework of the defendant's trial, which requires relief. And so in Rodriguez, this court, in applying the rule in Wheat, found that a court must review the objective facts about whether or not a conflict is likely to occur. And if, after reviewing those, the conflict is unlikely to occur, or if the conflict can be completely avoided, then there simply cannot be a serious potential for conflict that justifies disqualification. Now, there were several facts in Rodriguez that were important for the determination that there wasn't a serious potential conflict. One of them, as we already discussed, was that the witness wasn't called. But another one, and what I would argue was the most important fact to the Rodriguez court, was that the conflict could have been completely avoided. On page 673 of the Rodriguez opinion, the court says the following, Having co-counsel cross-examine the witness would have eliminated all risks, and this easy solution, which the state judiciary ignored, makes it unreasonable for a state to have denied Rodriguez the benefit of his counsel's services. Counsel, what was the relationship here between Attorney Charles Murphy and the co-counsel that you've said should have handled something, handled cross of Trawick? Your Honor, the record suggests that Ms. Donford Jansky was working with Charles Murphy. The record's not clear that they were a part of the same law firm, but they were working together. So this is one of the things that concerns me about this issue more broadly, and with the Rodriguez opinion as well. I guess I don't quite understand why having a different face in the same defense team actually solves the problem. Your Honor, there's no indication in the record whatsoever that Don Perjansky had any former representational relationship with Trawick. No, but she's teamed up with somebody who did. So why wouldn't reasons for disqualification be imputed to her? Well, Your Honor, similarly in Rodriguez, the two attorneys had teamed up together to represent the defendant. I know that Rodriguez said that, but that seems to me to be in some tension with vast bodies of professional responsibility law, at least as I'm familiar with it. Well, Your Honor, again, there's no indication that Mr. Jansky had any former relationship with Mr. Weaver. She came and represented Weaver throughout this trial, sometimes on her own. And Rodriguez court found it very important that if another attorney was there. I know. I'm asking you why. If you were disqualified, we would be happy to see Mr. Legrand again, but I'm not sure that that would really solve a disqualification problem, unless we're getting into the kind of internal walls that are built sometimes in law firms and so on. But we don't have any indication of that here. Well, Your Honor, again, there was no indication that Mr. Jansky knew anything about Tralick from Charles Murphy's previous representation of Tralick. Okay. This may not be productive to pursue further, but I've raised the issue. But it seems to me pretty clearly your choice of counsel argument is your strongest one. And the thing that concerns me the most about your argument on this score is the language we find in Wheat that warns against hindsight, such as what happened at trial, namely Traywick is not called, and that obviously gives an awful lot of discretion to trial courts in coping with the uncertainties posed by these potential conflicts. Yes, Your Honor. And no doubt the Wheat says that trial courts do have some discretion, but that discretion is not unfettered. It's necessarily bound by the framework that Wheat creates. You have to show that there is some serious potential for a conflict. And that's why Rodriguez is so important. Rodriguez shows how to apply that principle to a certain set of facts. And it's so important for this case because that particular set of facts is almost directly on point with Mr. Weaver's set of facts. Like we said before, the conflict could have been avoided not only because Don Projansky could have done the cross-examination, but also you'll see in supplemental appendix pages 51 to 53, Charles Murphy said that he would limit his cross-examination in a way so that any potential conflict the state thought might come up wouldn't come up because he wouldn't ask those particular questions. I'm a little mixed up because on the choice of counsel issue, when I review, and I did review the state trial court transcript, I didn't see any offer by Murphy or Weaver to have co-counsel conduct any cross-examination of Trawick. Yet now, Weaver's arguing that would have solved everything. Now, how can it be error for the state court to disqualify Murphy when this possibility was never presented to the court? How is that part of the claim not defaulted? I'm a little mixed up here. Well, Your Honor, it's because when evaluating this claim, the court should have looked into various possibilities for avoiding the conflict. So while it's true that they didn't discuss the fact that Don Projansky could have done the cross-examination, counsel did say on the record in pages 51 to 53 of our supplemental appendix that he was willing to limit his cross-examination such that any potential conflict wouldn't actually come up during his cross-examination of Trawick. Additionally, you can see in the record in the state's motion to disqualify Charles Murphy, something that's particularly important is they don't move to disqualify Don Projansky. That motion is only to disqualify Charles Murphy. So it appears from that motion, at least, the state wasn't thinking that just disqualifying Charles Murphy necessarily meant Don Projansky had to be removed from the trial. There are several other factors in Rodriguez that were also important to the court for finding that there wasn't a serious potential conflict. One was that in both cases, the witnesses were represented in unrelated cases. So this isn't a situation like in Wheat where defense counsel was contemporaneously representing a potential witness about the same set of facts or representing co-defendants. Trawick's representation was on a prior unrelated narcotics charge that had nothing to do with Mr. Weaver's charge for first-degree murder. It had something to do with Weaver, though, didn't it? Well, yes, Your Honor, but the inquiry here is not about the relationship between Weaver and Trawick. Obviously, Weaver being the defendant is going to have a number of relationships with various witnesses that might be called at trial. What matters is the relationship between Trawick and Charles Murphy, his attorney. And in that relationship, Charles Murphy represented him on an unrelated narcotics charge. As the state admits in the response brief on page 4, it was an unrelated criminal matter. So all of these various facts, the fact that the conflict could have been avoided either by having Don Projansky do the cross-examination or by limiting cross-examination, the fact that the witnesses were represented in an unrelated case, the fact that they never called the witness at trial, and the fact that the state here didn't even know what the witness was going to say if they did call him. They hadn't interviewed him before the disqualification hearing. They had a statement, though, right? There were two statements. Yes, Your Honor. One exculpatory for Weaver, one inculpatory, right? Yes, Your Honor. But the state does say in supplemental appendix page 44 to 45 that they hadn't done their own investigation. They hadn't gone and talked to Trawick to see what it was that he was likely to say. So they hadn't done the due diligence to figure out if something that could potentially create a conflict was actually likely to occur. And that's necessary to figure out if the conflict is going to be a serious potential conflict that justifies disqualifying a defendant's chosen counsel. It justifies denying that defendant a right. Even if they had interviewed him at that point, though, they still couldn't be sure what he would say, right? No, Your Honor. But there's at least a requirement to do some diligence, to present some evidence that there is going to be a serious conflict. So the state should have done some form of investigation, some form of interview. I mean, as Judge Hamilton pointed out, if you got somebody that testified both ways, why would you put him on? They ultimately didn't put him on. And they said that it didn't matter. And those questions, with those questions. I'm sorry, Your Honor? Went in and asked those questions that you're talking about. Well, I think I'm misunderstanding the question. They did call him and put him on the stand, right? No, Your Honor. They did not call this witness. No. I thought that's what you just told me. No, no. They chose not to call him, and that was my point, because he testified both ways. The statement had two different responses, statements. Yes. The state never chose to call this witness, which is another reason why a conflict here was unlikely to actually occur. So, Your Honor, with all those facts in mind, this court found in Rodriguez that there was no serious potential conflict. Likewise here, because all these facts exist, there is no serious potential conflict that can justify disqualification of defendants counsel. Now, it appears that Lupe's multiple confessions to being involved in Sanders' murder would have corroborated Calico's original statement to police that he believed both Lupe and Weaver were involved. And, of course, the evidence showed three guns and at least two shooters. So how could the failure to introduce Lupe's confessions have harmed Weaver? Your Honor, Lupe's confessions actually said that Lupe was involved in the murder with another individual named Pierre, not Wendell Weaver. So, yes, the record does indicate that there were two shooters, but the affidavit submitted by Tolliver says that it was Lupe and this other person, Pierre. And if there are no further questions, I'd like to reserve the rest of my time for rebuttal. All right. Mr. Elsner? Good morning and may it please the court, counsel. I'm Assistant Attorney General Evan Elsner, representing respondents in this matter. I wanted to turn first to the subject matter that was the primary, that consisted of the primary portion of Appellant's argument, the question on this choice of counsel issue. And I want to first point out that Rodriguez is, in fact, the clearly established Supreme Court precedent controlling this habeas claim, Wheat is. And Wheat doesn't say anything about looking in hindsight to determine whether or not an actual conflict of interest, whether or not the actual potential conflict burgeoned into an actual conflict at trial. In fact, it says the exact opposite, that because the attorneys in the matter can't necessarily know what's going to happen as trial progresses, that the trial court needs to be responsible for making a determination before trial begins whether or not there's a serious potential for conflict of interest. So where do we see in the state court the application of Wheat and the presumption, to begin with, in favor of the defendant's choice of counsel? Sure. So in the Illinois Appellate Court's opinion, they specifically cite to Wheat to begin the opinion. And then they go on to consider multiple Illinois Supreme Court cases, which, in fact, clarify how the Illinois Supreme Court determined that it wanted Wheat to be applied in Illinois. Where do we see the presumption, just for starters, the presumption in favor of the defense's choice? So specifically, where we see it is in its citation to those cases and the portions of those cases which directly address the presumption. I'm assuming you know these cases in Illinois better than I do. Yes. So can you point me to what's the strongest indication that the Illinois Appellate Court took into consideration the presumption that has to be the starting point under Wheat? The cases of People v. Ortega and People v. Holmes that the Illinois Appellate Court cited in making its choice of counsel determination here specifically established these four criteria, these four factors, that it would like for trial courts to consider. And I don't see that presumption, the Wheat presumption, anywhere in those four factors. So if we look to those cases and the Illinois Supreme Court's rationale for establishing those four factors, it specifically states that the reason that those four factors exist is in order to consider the presumption in favor of choice of counsel. And that only where these factors are going to come into play can that presumption be overcome. So the Illinois Appellate Court isn't necessarily required to specifically lay that out. It doesn't have to do that. I want to know when it's silent about this critical starting point. You've given me an answer on that. Thank you. And I'm troubled in the Illinois Appellate Court's opinion where it talks about the record. This is at page 10 of its opinion. The record shows an appearance of impropriety regarding Charles Murphy's possible concurrent representation of defendant Ann Traywick. What's the evidentiary basis for that possible concurrent representation? I thought it was just that Murphy went to go talk to this guy who was on the state's witness list. And he denies and Traywick denies there was any representation. Traywick does not deny that there was any representation. Sorry, Traywick's silent, right? Traywick is silent. Traywick hasn't been. So what does Murphy tell us? Murphy disclaims that there was a contemporaneous representation. However, what occurred when Murphy went to the jail to talk with Traywick was that he talked with him about Traywick's potential statement against his client, Petitioner, who also happened to be Traywick's boss. And in addition, the notes from Charles Murphy's visit indicated that he also discussed with Traywick Traywick's pending charge, which was a violation of probation and an underlying charge. The violation of probation was the probation that he received while being represented by Charles Murphy. And Traywick also additionally discussed with him his likely plea deal in that case. And so what the court was saying, what the trial court determined was that it didn't make an actual determination about whether the representations were contemporaneous. But what it said was there is a serious risk here that this could be construed as a contemporaneous representation. And at the very least, there's an appearance of impropriety of going to visit a former client in jail without a prover to discuss and discussing both. I'm sorry, without what? Without a prover. So what Charles Murphy does. What is an approver? I'm sorry. What do you mean by an approver? That he wasn't approved or. No, Your Honor, a space prover, which is to say an individual who could have who could have testified as a witness to the conversation. What kind of a person would. And for this type of a situation where an attorney is going to a jail in order to talk with a potential witness at trial, in order to discuss their. In order to discuss what they might be testifying to and in order to potentially get a statement on the record about which would either be consistent with what he says at trial or inconsistent and could be used for impeachment purposes at trial. Generally speaking, an attorney would go with an investigator. That's nice if you've got enough staff and money and so on and resources to do that. But are you saying it's suspicious somehow? In this case, yes. Did we did did Weaver instruct him to talk to this? The record doesn't indicate whether Weaver instructed him. Was there any suggestion, any inference? No, Your Honor. But it's important to really to understand the relationship between this cast of characters here. It's not simply that Charles Murphy had represented this unrelated witness and was now representing Petitioner. What we have here is a lower level drug dealer, Rondell Trawick, who is now a state witness. We have Charles Murphy, who has represented that state witness previously and is now going to the jail to talk with him about his potential statement against his gang boss. Right. But anybody who represented Weaver would need to talk to Trawick, right? Would have a very legitimate reason to talk to him once the state puts him on the witness list. Correct. Right. So it doesn't seem doesn't seem to me that that adds very much. Well. That is the fact that the relationship between Trawick and Weaver doesn't add very much to this. What it adds is that you is most importantly, what it what it creates is an appearance of impropriety, which is what the Illinois appellate, the Illinois trials were. What's the impropriety? Yeah. Where is that? The impropriety is that is that petitioner has counsel who is visiting. Excuse me. Let me back up. You have a witness who has provided to their two variations of a statement about petitioners involvement in a murder. One of those statements is that petitioner and Lupe both admitted to their involvement in the murder. The other is that just Lupe admitted to the involvement in the murder. Now, petitioner's counsel, Trawick's former counsel, goes to visit Trawick in jail with nobody else present and said and says, I would like to talk to you about your statement against my client, your boss, petitioner. And he suddenly he comes out of that meeting with a statement that is advantageous to petitioner that is that petitioner didn't actually admit to didn't actually admit to his involvement in the murder. There's no would have been OK if it wasn't advantageous. It's not appropriate at all for him to be going in for him to be going in without anybody else present to talk to a state witness who he had previously represented. Where does that come from? Right. Talk to a witness by himself. One of his former clients. The lawyer is going to talk to one of his former clients about one of his current clients. The lawyer, the lawyer's relationship with that former client, the entire basis for it was because the current client, his current client established their set them up together as a council. I thought I thought you agreed a moment ago that maybe maybe not. But let me know if you disagree with this, that anybody representing Weaver in this case would have to talk to Trawick period. Right. That's that's correct. OK. And so what makes this suspicious in your mind or raises the potential for conflict is the fact that he didn't take anybody else with him. And that he that counsel did not and that counsel had formerly represented Trawick in this admittedly unrelated matter. Had formerly represented him and was now discussing with him. Current legal issues that he had pending. He has to do that. Right. Excuse me. The lawyer, the lawyer has to talk with him about those issues. Right. I mean, you know, any any any examination of Trawick is going to have to deal with his current legal troubles. Right. Not necessarily. He had been there. There's no there was no reason for Charles Murphy to be talking to Trawick about whether or not he was going to be accepting a plea deal in his case. When a guy is you don't think a defense counsel should be talking to a potential state witness about his potential plea deal. That's the most routine sort of examination and impeachment. It wasn't a plea. I'm sorry, Your Honor. This wasn't a plea deal in exchange for his testimony. Well, Murphy doesn't know that. Right. Until he talks to him about it. That's possible. He'd be glad if two people had walked in to talk to Trawick. You would be seeking disqualification against both of them. What's the difference if there's one or two or 14 people in there? Your Honor, the point of this entire the point of this entire problem predicament is that when if a jury were to learn that petition, if a jury were to learn at trial that petitioner's counsel went into went into the jail where his petitioners were counsel's former client was sitting and suddenly secures an advantageous statement to petitioner. There is a clear appearance of impropriety. The appearance is that my question is this. So let's say there were two of them sitting there. Does that change the calculus here? It does. It does, Your Honor. And it's because we don't know what's going on in this in this conversation. We don't have any witness who can testify who can testify about about what was said during this during this meeting between between Charles Murphy and Rondell Trawick. And so what what so what we have is Charles Murphy's word that he didn't say didn't say anything improper, didn't didn't necessarily say, look, I'm representing your boss. We're going to make things hard for you. If Murphy had brought in an investigator who works for him, of course, and the investigator had the same exact story as Murphy, that would be OK. If an investigator went in, then there would be a substantially lower appearance of impropriety for the jury because an investigator would there be and would there be any. It obviously would would depend on what the investigator ends up saying if he testifies. But but he could. But at the very least, there would be someone available who could testify as a witness and alleviate that appearance of impropriety. Even if he's just a full time employee of Murphy's. Right. Yes, because what works better. Yes, because what Murphy was doing was essentially inserting himself into into the case, making himself a potential witness in this case. And this court has found, in fact, that that that interviewing a witness without a prover could have constituted ineffective assistance of counsel. So. So there's a serious problem with Charles Murphy going in to visit, going in to visit Rondell Trawick without anybody else present and suddenly securing securing an advantageous statement to his client. And do you have a citation to that case? I'm sorry. It's potentially. It's a case that's actually cited. That's actually cited by my opponent. The Jones case. I can. But we're happy to submit to submit a real 20 day letter or something to that effect to clarify which citation it is. But what we would say going forward, the cross examination of Calico was obviously key to Weaver's defense, and I certainly understand your claim that his credibility and even his powers of observation were thoroughly explored. But the change from his original statement that he saw the shooter on foot when all of the evidence pointed to the shooters being in a car goes right to the heart of his identification of Weaver. How could that unique evidence be called cumulative? And why was it not ineffective assistance to apparently forget to ask that key question with with regard to how it could. With regard to the first point, there was. Petitioner overstates his position when he says that all of the evidence pointed to a drive by shooting and not a shooter on foot. That was that was petitioners theory of the case. But there was absolutely no there was absolutely no expert testimony to that effect or admission by the state that this was exclusively a drive by. And so petitioners claim that that asking this question and getting Calico on record as saying that petitioner was on foot would have blown this case wide open presupposes that the jury believed his overall theory of the case, which was that this was a drive by and not a combination of a drive by and a shooter on foot. And so there was there were two possible scenarios. It could have been that this was a drive by or it could have been. This was a drive by with a shooter on foot. And so there's no reasonable probability of a different outcome in a case where we don't even know whether the jury believed his overall theory of the case that this was exclusively a drive by. But additionally, as to the point about deficient performance, what we're talking about here is a counsel who made who, yes, made a mistake in not being clear enough when he thought that he was eliciting the proper and clear impeaching testimony regarding the on foot statement. But the Sixth Amendment does not entitle petitioner to error free representation, entitles him to constitutionally adequate representation. And that's what. And what possible what possible strategic reason is there for not impeaching Calico with his statement to Delaney on the day of the shooting that he didn't see the shooter? Your Honor, with regard to Delaney, it's important to be clear that the argument is not necessarily is not that Delaney there was a strategic reason for not calling Delaney, but rather that counsel made efforts to find Delaney. And when he couldn't find and when he couldn't find Delaney, he applied an alternative strategy, which was the best that he could do at that point when he couldn't find the witness. And that was to spin Delaney's absence as a flaw in the state's case. And he did that at several points in his closing argument. And he did that and he did that when he attempted to get a jury instruction, presuming that Delaney would have provided testimony that was hurtful to the state's case. And while that particular effort that counsel made was unsuccessful, it was based off of civil some civil cases that he had found. And he was he was trying very hard to have the court extended to the criminal context. What this shows was that counsel here wasn't completely shirking his responsibilities to investigate Delaney and try to deal with the Delaney issue, but rather that he did the best that he could when he couldn't find Delaney. And the record indicates that everyone was having difficulty, in fact, finding Delaney. The state also was having difficulty finding him. And it was because Delaney had left town and was somewhere else. And so that overall looking at counsel's overall conduct here, it didn't fall fall below an objective standard of reasonableness. He did he he did what a counsel would do the best that he could, given the cards that he was dealt. Thank you, Your Honor. I may first address the point that the state made about there would be no appearance of impropriety if someone else was with Charles Murphy during the interview. I'm quoting from Supplemental Appendix page 21. This is the state's motion, the prosecution's motion to disqualify Mr. Charles Murphy. It says that there was an interview of Rondell Traywick by attorney Charles Murphy and another individual that works for Charles Murphy. So there was somebody else there. If having someone else there alleviates the appearance of impropriety, then there was no appearance of impropriety. Second, regarding whether or not there could have been two or three shooters, the prosecution said on the record... Did you just say, I'm sorry, did you just say there was a prover there? Yes, Your Honor. In Supplemental Appendix page 21, the state says that Charles Murphy and another individual that works for Charles Murphy was at the interview. That's what it says. What page? 21. People's motion to disqualify attorney based upon conflict of interest. Additionally... Just a minute, counsel. Judge Hamilton has a question he wants to address. Go ahead. Counsel, could you address that point? We just had this long discussion about... Right. How important it was that nobody else was there and the prosecution motion to disqualify says somebody else was there. Please, yeah, it'll be recorded that way. Excuse me for interrupting, Mr. Wray. I'd like to get to the bottom of this. Your Honor, first of all, there's no indication as to who this individual was. It could have been co-counsel Don Perjanski, first of all, which would again be inserting petitioner's counsel as a witness. Do you have any basis other than sheer speculation for that point? No, Your Honor, the record other than this is unclear to my knowledge. You need a hearing on that, don't you? I'm sorry? Don't you need a hearing on that? Our position would be that there's no requirement for an additional hearing on that because the appearance of impropriety is one of a number of factors that ultimately led to the trial court's disqualification of Murphy, and so it's possible that I misspoke regarding that particular point on whether a proofer was present, but there were several other factors that were considered by the trial court. My God, we talked about it for 15 minutes. I apologize, Your Honor. Thank you. Your Honor, regarding some of the other claims during the State's presentation, first that there could have been two or possibly three shooters, the prosecutor said on the record just prior to closing arguments that their theory was Excuse me, counsel. Judge Rovner, are you still with us? I'm afraid why don't you just have a seat, counsel? Thank you, Your Honor. It shouldn't take very long. Sorry, we're interrupting your rebuttal to an extraordinary degree. Thank you. She's not here. Can you call her? This we can blame on the weather because Judge Rovner has snowed in outside of Chicago on the East Coast. No. There we hear you. Are you back with us? I am. I don't know what happened. Oh, my gosh. Well, you just disappeared and now you're back. Oh, I bet you were thrilled. Nothing has happened. I bet you were thrilled. Well, we stopped as soon as I couldn't see your face, so you didn't miss anything. Thank you. Sorry. All right, so we're ready to start with the resume the rebuttal argument. Counsel? Yes. Another point the state made was that it wasn't clear from the record whether the shooter was on foot or in a car. They said the jury could have believed either way. But the prosecution, just prior to closing argument, said on the record that their theory was that the shooter was in a car. So that's another issue with the state's presentation. Additionally, the state said that potentially Rodriguez isn't something this court should look to. It should just look to we. Rodriguez showed how this court applied we to specific facts. And, in fact, this court has applied Rodriguez in other habeas cases. For example, Carlton v. Jess, a 2008 case, this court called Rodriguez the governing law of the circuit regarding certain points about counsel of choice. Additionally, there was a discussion about whether representation was concurrent or if it was prior representation. First of all, Murphy does say on the record there was no concurrent representation happening at this point. But, ultimately, that doesn't matter because under the Rodriguez case there was concurrent representation happening there. And then, finally, Your Honor, on the point about the ineffective assistance for failing to cross-examine Calico, that piece of cross-examination evidence was different in both kind and different in importance. To all the other cross-examination evidence that came out at the trial, just a cursory review of the record shows just how vitally important that cross-examination evidence was. In opening argument, supplemental appendix page 101 and 102, counsel says that it's a very important fact that no one was standing on the street and that the people were in a car. Additionally, in the affirmative case brought by defendant, although you saw from our briefing that counsel should have called up to seven different witnesses, counsel ultimately only called one person. That one person, the whole reason they were called was to say that no one was standing on the street, the shooters were in a car. And then, fast forward to right before the closing argument, it's clear in supplemental appendix page 197 that counsel is intending to argue that Calico's prior statement about that day. In addition to it just being different in importance, it's also different in kind. This, unlike all the other cross-examination evidence about whether Calico had been smoking dope the day of the trial, whether he was in a gang, whether he had a good vantage point, this piece of evidence went to whether or not Calico was telling the truth on the stand. If what he was saying he saw could have possibly happened. It's the difference of saying something is somebody's uncredible versus saying that somebody said they saw a blue car when it was really a red truck. So, this was just different in kind and import to the other lines of cross-examination. So, like this court found in Tolliver v. McCarthy, when the state court doesn't appreciate the type of evidence that's being brought and doesn't put it into context of the overall defense that is being brought, it's ineffective. The state can improperly apply strictly. So, we would just ask the court to reverse the district court and grant Mr. Weaver's habeas petition. Thank you. Mr. Ray, you and your firm were appointed in this case, were you? Yes, sir. The court thanks you for your vigorous representation and your client. Thank you, Your Honor. Thanks to both counsel and the case will be taken under advisement.